IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

FILED
4/25/2019
Clerk, U.S. District Court
District of Montana
Helena Division

ELLEN MARTEN, as Guardian and Conservator of Glen Marten,

Plaintiff,

vs.

GENE HAIRE, STATE OF MONTANA, DOES 1-10,

Defendants.

CV 17–31–H–CCL

OPINION
&
ORDER

Before the Court is Defendant Gene Haire's motion for summary judgment, which is opposed by Plaintiff. Having reviewed the briefs and the record and no party having requested oral argument, the Court is prepared to rule.

**LEGAL STANDARD**

Fed.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Summary judgment or adjudication is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *T.W. Elec. Serv., Inc. v.*

1

*Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita,* 475 U.S. at 586, n. 11.

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. Fed.R.Civ.P. 56(a), (c); *see also, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences from the facts must be drawn in favor of the opposing party. *Anderson,* 477 U.S. at 255.

The moving party, in supporting its burden of production, "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000). A "complete failure of proof concerning an essential element of the nonmoving

2

party's case necessarily renders all other facts immaterial" to entitle the moving party to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire,* 210 F.3d at 1102. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

Once the moving party has met its initial burden, the burden shifts to the non-moving party to establish the existence of a general issue of material fact. *Matsushita,* 475 U.S. at 586 – 87. The non-moving party may not rely on the allegations or denials of its pleadings but must cite to facts in the record. Fed. R. Civ. P. 56(c)(1); *Matsushita,* 475 U.S. at 586, n. 11. Moreover, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir.1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana,* 336 F.3d 885, 889 (9th Cir.2003).

## STATEMENT OF FACTS[1]

Glen Marten (Marten) "is an incapacitated adult who suffers from developmental, cognitive, physical and psychological conditions." (Doc. 53 at ¶ 1). MDC is a State-run facility for people with serious intellectual disabilities who have been determined to pose an imminent risk of serious harm to themselves or others." (Doc. 53 at ¶ 2). Marten was evaluated at MDC in 1990 and was "involuntarily committed at MDC due to his violent outbursts" for "a significant amount of time – approximately 15 years total" – on three separate occasions since 1990, most recently from February 2009 to November 25, 2014. (Doc. 53 at ¶¶ 3 and 5).

Defendant Gene Haire (Haire) began working as the MDC Superintendent in May of 2011. (Doc. 44-4, Depo. Haire 20:22 - 24 (May 18, 2018)). At that time, the maximum number of clients who could be served at MDC was 68. (Doc. 44-4 at 25:16 - 21). Haire served in that position until May of 2015, when he retired. (Doc. 44-4 at 32:6 - 11). Haire directly supervised MDC's Clinical Services Director, Polly Peterson, who supervised MDC's medical personnel. (Doc. 44-4 at 22:5 - 10). Defendant State of Montana and Haire admit that "with

---

[1] Because Plaintiff opposes summary judgment, the Court accepts as true all facts for which Plaintiff provides support in the record and draws all reasonable inferences in favor of Plaintiff. *Anderson*, 477 U.S. at 255.

4

respect to the conduct of Haire of which Plaintiff complains, Haire acted within the course and scope of his employment with the State." (Doc. 41 at ¶ 11).

According to Dr. Lemons, one of Plaintiff's retained experts, Marten required help getting up and was weak after falling at MDC on September 11, 2014 – the "first sign of spinal cord injury." (Doc. 69-3 at 4). Marten "suffered progressive signs and symptoms of his cervical disc herniation and spinal cord dysfunction" from September 11, 2014 to December 3, 2014. (Doc. 69-3 at 5).

During this time, Dr. Justad, who contracted with the State to provide services at MDC, was Marten's primary treating physician. (Doc. 53 at ¶ 9). Dr. Justad ordered an MRI of Marten's brain in October, but did not follow the recommendation of MDC staff to order an MRI of his entire spine. (Doc. 53 at ¶¶ 34, 35 and 37).

Haire met weekly with MDC medical staff, including Dr. Justad, (Doc. 53 at ¶ 17). He was generally aware of Marten's medical issues during the fall of 2014 and was concerned about Marten. (Doc. 53 at ¶ 19). By the end of October, 2014, Haire was aware that Marten's entire treatment team was recommending that Marten have an MRI of his entire spine done in one visit and that Dr. Justad did not want to order an MRI of the entire spine. (Doc. 44-4 at 255: 1 - 256:18).

Haire "relied on the expertise and skills of people who were licensed to

5

provide medical care to Marten." (Doc. 53 at ¶ 19). Haire "continued to communicate with Dr. Justad and the nursing director in the Monday meetings and in other conversations, and felt that they were taking the actions that they felt needed to be taken." (Doc. 44-4 at 232:24 – 233:3).

On November 25, 2014, "MDC staff made the call to take Marten to the ER at St. Peter's Hospital." (Doc. 53 at ¶ 44). At St. Peter's, Marten "was admitted to the intensive care unit with severe pulmonary emboli." (Doc. 44-33 at 2). When that condition improved, "the biggest concern became his lower extremity weakness and concern of spinal cord lesion." (Doc. 44-33 at 2). After Marten's pulmonary embolus stabilized, an "MRI was obtained documenting the very severe and impinging C4-5 disk." (Doc. 44-33 at 2 - 3). Marten had decompressive surgery on December 3, 2014. (Doc. 44-33 at 3).

According to Dr. Lemons, MDC medical staff should have properly diagnosed Marten and referred him for surgical intervention "[a]t the latest . . . in the first week of October." (Doc. 69-3 at 13). Dr. Lemons opines that the "delay in diagnosis and referral significantly injured Mr. Marten's cervical spinal cord" and that "Mr. Marten would have had a significantly better outcome" had MDC medical staff "recognized the potential for cervical spinal cord dysfunction in the weeks following the [September 11, 2014] fall." (Doc. 69-3 at 13).

6

Marten was discharged from St. Peter's to Benefis in Great Falls on December 10, 2014. (Doc. 53 at ¶ 48). According to Dr. Lemons, [a]t the time of discharge, he still had significant spinal cord dysfunction." (Doc. 69-3 at 13). Marten moved to a skilled nursing facility in Great Falls at the end of January 2015. (Doc. 53 at ¶ 49). Since August of 2016, Marten has resided in a residential facility in Helena. (Doc. 53 at ¶ 50).

## DISCUSSION

### Count VI – Negligence

In Count VI of her complaint, Plaintiff alleges that Haire knew about Marten's rapid physical decline and breached his duty to ensure that Marten received the medical care he needed, causing Marten to suffer injury. (Doc. 4 at ¶¶ 216 - 217). Haire seeks summary judgment as to Plaintiff's state law negligence claim on the grounds that he is immune under state law. (Doc. 43 at 7).

Haire raised the state immunity issue in a motion to dismiss filed in July of 2017. (Doc. 17). The Court held that Haire was not entitled to early dismissal, based in part on a concern that the State of Montana might change its position as to whether Haire was acting in the course and scope of his employment over the course of litigation based on information obtained in discovery. (Doc. 24 at 7). Discovery closed at the end of October of 2018, and there is no indication that the

7

State of Montana has changed its position as to whether Haire was acting within the course and scope of his employment when he engaged in the conduct that forms the basis of Plaintiff's claims against him. Plaintiff herself appears to acknowledge that her claims against Haire are all based on his alleged failure to adhere to his duties and responsibilities as an employee of the State of Montana. (*See e.g.* Doc. 53 at 34, ¶¶ 49 - 53). Counsel for the State continues to represent Haire and the State continues to argue that Haire is entitled to statutory immunity as to the state law claim against him, addressing the Court's earlier concern that the State might change its position as to Haire's status and entitled to statutory immunity.

Haire argues that he is entitled to immunity under the second sentence of Mont. Code Ann. § 2-9-305(5), which states: "In an action against a governmental entity, the employee whose conduct gave rise to the suit is immune from liability by reasons of the same subject matter if the governmental entity acknowledges or is bound by a judicial determination that the conduct upon which the claim is brought arises out of the course and scope of the employee's employment, . . . ." Plaintiff relies on *Story v. Bozeman* to argue that § 2-9-305 only provides Haire immunity from recovery if the State is also ordered to pay damages and does not provide immunity from suit. (Doc. 52 at 24 – 26).

This Court, acting through the Honorable Donald W. Molloy, recently rejected a similar argument, noting that, since deciding *Story*, the Montana Supreme Court has "made clear that § 2-9-305(5) mitigates claims against individual employees for actions performed within the scope of their employment when a suit against the government entity arises out of the same subject matter." *Estate of Ramirez v. Bozeman*, No. CV 17-52-BLG-DWM, 2019 U.S. Dist. LEXIS 14896, at * 28 (Jan. 30, 2019)(citing *Griffith v. Butte*, 244 P.3d 321, 335 (Mont. 2010)). This Court follows the Montana Supreme Court when construing Montana statutes and agrees with Haire that the "explicit grant of immunity in the second sentence of § 2-9-305(5) MCA belies [Marten's] contention that the statute serves merely as an anti-double recovery statute." *Germann v. Stephens*, 137 P.3d 545, ¶ 41 (Mont. 2006). Haire is entitled to immunity as to Plaintiff's state law negligence claim and Count VI of the complaint is therefore dismissed.

### Count VII – § 1983

Haire argues that he is entitled to summary judgment as to Plaintiff's § 1983 claim against him because Haire did not violate Marten's constitutional rights. In the alternative, Haire argues that he is entitled to qualified immunity.

Plaintiff contends that the "civil rights claim asserted against Haire has two (2) prongs: he directly deprived [Marten] of his constitutional rights by deliberate

9

indifference to his dire medical condition and, additionally, he has supervisory liability for his deliberate failure to have adequately supervised employees under him, despite knowledge that their failures were causing constitutional deprivations." (Doc. 52 at 10). Both "prongs" of Plaintiff's §1983 claim against Haire appear to be based on Haire's failure to intervene in Dr. Justad's medical decisions as to Marten's treatment. Plaintiff also argues that Haire is not entitled to qualified immunity, relying on *Ammons v. Washington Dep't of Social and Health Services*, 648 F.3d 1020, 1027 (9th Cir. 2011).

### *Violation of Marten's Constitutional Right*

The United States Supreme Court first considered "the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution" in *Youngberg v. Romeo*, 457 U.S. 307, 314 (1982). Such cases are decided under the substantive rights granted by the Fourteenth Amendment rather than the cruel and unusual punishment clause of the Eighth Amendment because individuals "who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 322.

*Youngberg* "created a standard whereby whether a hospital administrator has violated a patient's constitutional rights is determined by whether the

10

administrator's conduct diverged from that of a reasonable professional." *Ammons*, 648 F.3d at 1027. Courts generally refer to this standard as the "*Youngberg* professional judgment standard." *Id.*

Having taken custody of Marten through an involuntary commitment, the State had a duty to provide him with "adequate food, shelter, clothing, and medical care." *Youngberg*, 457 U.S. at 324. Haire, as the administrator of MDC, had a duty to ensure that Marten was provided with adequate medical care, and the alleged denial of such care can form the basis for a claim under 42 U.S.C. § 1983 for denial of substantive due process under the Fourteenth Amendment against Haire in his individual capacity. *See Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016).

Individual liability under § 1983 can only be imposed on Haire if his decision not to intervene in Dr. Justad's medical decisions regarding Marten was "so objectively unreasonable as to demonstrate that he . . . actually did not base the decision upon professional judgment." *Estate of Conners v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988). Haire was aware of Marten's medical problems during the fall of 2014. (Doc. 53 at ¶ 19). He defends his decision not to intervene in Marten's medical care by claiming that he "relied on the expertise and skills of people who were licensed to provide medical care to Marten." (Doc. 53 at ¶ 19).

11

Plaintiff Haire explained his understanding of his supervisory role over professionals in fields other than his own (e.g. licensed psychologists, lawyers and medical doctors) during his deposition, stating:

> I think it's common in not only the field of human services but in some other fields to have overall leaders who provide supervision to people who – who also have their scope of practice. So there's a process of providing guidance and supervision that doesn't intrude into that person's scope of practice, so that there is deference to, for example, a licensed psychologist, which Dr. Peterson was, I supervised her, but I didn't question her or attempt to supervise her work with regard to her scope of practice. So the same thing would have been true for Dr. Peterson's supervision of the doctors. Another example would be when I was at the Board of Visitors I supervised the lawyer that ran the legal services program at Montana State Hospital. I didn't intrude into his scope of practice as an attorney, but I provided supervision.

(Doc. 44-4 at 67:21 – 68:14). In response to a follow-up question asking whether Dr. Peterson, who is not a physician, would know whether Dr. Justad was providing proper medical care to a given client, Haire stated: "She would rely on Dr. Justad functioning appropriately within her scope of practice." (Doc. 44-4 at 68:15 - 22).

Based on its review of Haire's deposition and the other materials referenced by the parties in support of and opposition to Haire's motion for summary judgment, the Court has determined that the undisputed facts demonstrate that

12

Haire exercised his professional judgment when he decided not to override Dr. Justad's decisions regarding Marten's medical care. The fact that Haire chose to defer to Dr. Justad's medical judgment, even when the other members of Marten's treatment team disagreed with Dr. Justad, was not so objectively unreasonable as to rise to the level of gross negligence.

### *Qualified Immunity*

Qualified immunity protects a government official from civil liability unless the official's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). There are two prongs to the qualified immunity analysis – whether defendants have violated a plaintiff's constitutional right and whether that right was clearly established at the time the violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court has already decided the first prong of the qualified immunity analysis, having determined that Plaintiff failed to establish that Haire violated Marten's constitutional rights under the Fourteenth Amendment. The Court will nevertheless consider the second prong – whether the right allegedly violated by Haire was clearly established.

The parties agree that under the second prong of the qualified immunity test, Plaintiff "must identify a clearly established right, particularized to the specific facts of this case, that Haire personally and knowingly violated." (Doc. 52 at 13). Each party cites *Ammons v. Washington Dep't of Social and Health Services*; Plaintiff to argue that Haire violated clearly established law, and Haire to argue that he did not.

Plaintiff Ammons was a patient at a "residential psychiatric hospital for severely emotionally and behaviorally disturbed children" starting in October of 2001. 648 F.3d at 1023. A 29 year old male staff member began sexually molesting Ammons in January of 2003, when she was 14. *Id.* at 1025.

Ammons "sued LaFond . . . under 42 U.S.C. § 1983 for violating her Fourteenth Amendment substantive due process right to safe conditions while in the custody of a state-run mental institution." *Id.* at 1023. LaFond was the institution's "Chief Executive Officer from 1995 to the end of March 2003." *Id.* LaFond moved for summary judgment on the grounds of qualified immunity and appealed the district court's denial of their motion. *Id.*

The Ninth Circuit rejected LaFond's qualified immunity defense because Ammons was able to cite to a previous Ninth Circuit case with "facts remarkably similar to those presented" in *Ammons*. *Id.* at 1028 (citing *Neely v. Feinstein*, 50

14

F.3d 1502 (9th Circ. 1995)). Neely, like Ammons, was a female patient "who had been allegedly molested by a hospital staff member" and "sued state mental hospital administrators and staff." *Id.* The Ninth Circuit held that *"Youngberg* and *Neely* serve as pre-existing, clearly established law as to what conduct supports infringement of the Fourteenth Amendment rights of involuntarily committed hospital patients." *Id.* at 1030 - 1031.

Plaintiff asks this Court to find that Haire, like LaFond, violated clearly established law, arguing that "Haire's conduct in this case parallels the conduct of LaFond in Ammons." (Doc. 52 at 22). The Ninth Circuit found that the following evidence supported a liability finding against LaFond: "(1) that she knew that Grant had been previously investigated for sexual abuse of a female patient yet she allowed Grant to continue working in a cottage housing female patients without taking steps to ensure that he was not given repeated opportunities to be alone with one or more of these patients; and (2) that she took no action in spite of increasing and documented evidence of the inappropriate relationship between Ammons and Grant." *Id.* at 1031.

Plaintiff here has presented no facts to show that Haire knew that Dr. Justad had been investigated for medical malpractice much less for medical abuse. At most, Haire was aware that the other members of Marten's treatment team

15

disagreed with some of Dr. Justad's decisions regarding Marten's care. LaFond's failure to protect Ammons from sexual abuse cannot be compared to Haire's deference to Dr. Justad, a qualified medical doctor, to make the final decision about Marten's medical care.

The United States Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Although *Youngberg* stands for the general proposition that the State has a duty to provide involuntarily committed mental patients with adequate medical care, *Youngberg*, 457 U.S. at 324, it does not clearly establish what constitutes adequate medical care.

The only case cited by either party that specifically applies the *"Youngberg* professional judgment standard" to a claim based on the denial of constitutionally adequate medical care is *Mitchell v. Washington*, 818 F.3d at 443. Mitchell, who was "civilly committed as a sexually violent predator to the Special Commitment Center ("SCC") by the State of Washington" sued the Medical Supervisor (Dr. Bell) and the Superintendent of SCC (Kelly Cunningham) based on their refusal to provide him with a specific treatment for Hepatitis C. *Id.* at 440 - 441. The District Court granted the defendants' motion for summary judgment, adopting the magistrate judge's ruling that they were entitled to qualified immunity because

"Mitchell presented no evidence that Dr. Bell's treatment of Mitchell did not meet the appropriate standard of care for a medical provider." *Id.* at 441. The United States Court of Appeals affirmed the district court's decision. *Id.* at 444.

Although the Ninth Circuit granted summary judgment to both Dr. Bell and Kelly Cunningham, the only standard of care addressed in the opinion is that of Dr. Bell. The issue in this case is not whether Dr. Justad's treatment of Marten violated the appropriate standard of care for a medical provider – it is whether Haire's refusual to override Dr. Justad's medical decision violated the appropriate standard of care for a non-medical provider with administrative oversight of medical personnel. Plaintiff has presented no evidence to establish that Haire breached his standard of care. Nor has Plaintiff presented controlling authority from the Ninth Circuit or the United States Supreme Court establishing that the administrator of a State institution has a duty to intervene in the decisions of a qualified medical doctor as to the appropriate medical care to be provided to involuntarily committed persons at the institution. In the absence of such authority, Haire is entitled to summary judgment based on qualified immunity.

**CONCLUSION & ORDER**

As discussed above, Haire is entitled to statutory immunity as to Plaintiff's state law negligence claim against him. Although Plaintiff has arguably presented

17

a genuine issue as to whether Dr. Justad's treatment decisions were reasonable, those facts are not material to the issues raised by Haire's summary judgment motion. The undisputed facts show that Haire exercised his professional judgment when he chose not to intervene in Dr. Justad's treatment decisions. Haire is entitled to summary judgment as to Plaintiff's § 1983 claim against him because Plaintiff cannot establish that Haire violated Marten's substantive due process right to adequate medical care or that the parameters of that right were clearly established during the relevant time period. Accordingly,

IT IS HEREBY ORDERED that Haire's motion for summary judgment (Doc. 42) is GRANTED. Counts VI and VII of Plaintiff's Complaint are DISMISSED with prejudice.

IT IS FURTHER ORDERED that the caption shall be amended to reflect the dismissal of Haire and the John Doe defendants from this case, leaving the State of Montana as the only remaining defendant. The Clerk of Court is directed to update the docket accordingly.

Dated this 25th day of April, 2019.

_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE